UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| BANC CARD GEORGIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:14-CV-300-TAV-HBG |
| | ) | |
| UNITED COMMUNITY BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiffs' motion for preliminary injunctive relief, in which plaintiff Banc Card of Georgia, LLC moves the Court to enjoin defendant United Community Bank, its officers, agents, and all persons in active concert or participation with it from (a) initiating further contact with any of those customers acquired by Banc Card pursuant to the agreements between the parties, (b) disclosing Banc Card's confidential business information, including, among other things, Banc Card's personnel information to third parties, and (c) directly soliciting Banc Card's employees and/or sales representatives [Doc. 1-2].

Plaintiff commenced this lawsuit in the Chancery Court for Loudon County, Tennessee [Doc. 1-2]. At the same time, plaintiff moved for a temporary restraining order ("TRO"). The state court granted the TRO, enjoining defendant, its officers, agents, and all persons in active concert or participation with it from (a) initiating further contact with any of those customers acquired by plaintiff pursuant to the agreements

between the parties; (b) disclosing plaintiff's confidential business information, including, among other things, plaintiff's personnel information to third parties; and (c) directly soliciting plaintiff's employees and/or sales representatives [Doc. 3-1]. The state court set the bond at $20,000 and ordered that the TRO would become effective at the time plaintiff executes and files the bond with the court [*Id.*]. It also set an injunction hearing for July 3, 2014 [*Id.*]. This TRO was approved for entry by counsel for both parties [*Id.*].[1]

Plaintiff subpoenaed witnesses for the July 3 hearing, one of whom, Security Card Services, LLC, filed a motion to quash the subpoena on June 30, 2014 [Doc. 3-3]. This motion to quash relied upon defendant's removal to federal court on the same day [*Id.*; Doc. 1]. In the removal papers, defendant asserts diversity jurisdiction [Doc. 1]. Plaintiff has asserted that defendant did not attach all of the documents from the state court to its notice of removal [Doc. 3].[2]

After the case was removed, on July 3, 2014, plaintiff moved the Court for an extension of the TRO and for the Court to set an injunction hearing [Doc. 3]. The Court granted that request and ordered that the TRO remain in effect through the injunction hearing [Doc. 4]. Defendant filed a response in opposition to the request for an

---

[1] The Court notes that the TRO was approved by different counsel for defendant than counsel on the record at this time. In addition, it appears that plaintiff executed and filed the bond with the state court.

[2] The Court does not address this allegation in any detail at this time, as plaintiff does not assert that this is a reason to deny the request for an injunction.

2

Case 3:14-cv-00300-TAV-HBG   Document 18   Filed 07/24/14   Page 2 of 19   PageID #: 353

injunction [Doc. 7], and the Court held a hearing on July 16, 2014, during which the Court received evidence in the form of testimony and documentation and heard oral argument [Doc. 13]. During the hearing, plaintiff also narrowed its request for an injunction—it asked the Court to enjoin defendant from continuing to disclose confidential information and from competing with customers acquired by Banc Card pursuant to the agreements between the parties.

At the conclusion of the hearing, defendant consented to extend the TRO through July 25, 2014 [Doc. 13], *see* Fed. R. Civ. P. 65(b)(2), and the Court took the matter under advisement. Upon consideration of the arguments of the parties, the evidence introduced into the record, and the relevant law, the Court **DENIES** plaintiff's motion for a preliminary injunction.[3]

## I.    Background

Plaintiff provides credit and debit card processing and settlement services to retail merchants and other companies [*Id.* ¶ 5]. Defendant is a financial institution that provides banking services at a number of locations in Tennessee, North Carolina, and Georgia [*Id.* ¶ 6]. Before 2003, defendant provided credit and debit card processing and settlement services to retail merchants and other companies [*Id.* ¶ 7]. But in 2003, defendant allegedly sold this line of business to plaintiff in exchange for an ongoing percentage of revenue generated therefrom [*Id.*].

---

[3] As plaintiff's complaint was filed in Tennessee state court [Doc. 1-2], it sets forth a claim for injunctive relief under Tennessee Rule of Civil Procedure 65.03. The Court, however, construes plaintiff's request for injunctive relief as one for issuance of a preliminary injunction under Federal Rule of Civil Procedure 65(a).

3

Case 3:14-cv-00300-TAV-HBG   Document 18   Filed 07/24/14   Page 3 of 19   PageID #: 354

On January 23, 2003, plaintiff and defendant entered into a "Referral Agreement" [*Id.* ¶ 8]. Pursuant to that agreement, plaintiff was to pay a quarterly fee of 10% of the revenue generated from merchants whose information defendant provided to plaintiff and with whom plaintiff established a relationship [*Id.*]. The parties entered into similar referral agreements until 2006 [*Id.* ¶ 9]. In 2006, the agreement was revised to provide that defendant would receive 22.5% of the revenue generated from the line of business that defendant was selling to plaintiff [*Id.* ¶ 10]. The last referral agreement entered into by the parties was dated June 1, 2011 [*Id.* ¶ 11]. The agreement, which defendant allegedly drafted, provided, among other things:

> 2. <u>Bank Compensation for Referrals.</u> During the term of this agreement and for as long as the merchants that have been accepted by Banc Card's processor to receive Processing Service as set forth in Section 3 below (collectively, the "Merchants") receive processing Services from Banc Card's processor, Banc Card shall pay to Bank quarterly a fee of 22.5% (twenty-two and ½ percent) of the Residual (as defined below) Banc Card receives as a result of the transaction volume of such merchants. For purposes of this Agreement, the "Residual" shall mean the remaining balance Banc Card receives as income after the provider of Processing Services retains its fee for providing such services to the Merchants. The Quarterly fee shall survive termination of this agreement.
>
> . . .
>
> 4. <u>Confidentiality.</u> Each party shall treat as confidential all information concerning the business of the other party or any Merchant that is learned during the course of performance hereunder. Such confidential information shall include, without limitation, any trade secrets, agreements, policies and procedures, processes, programs, know how, financial information, pricing models or information, Merchant names, customer lists, personnel information and computer and other technical data. Both parties agree that they cannot directly or indirectly compete on any

4

> merchant account that Banc Card is paying to Bank a fee. This paragraph shall survive termination of this Agreement.

[*Id.* ¶ 12]. This agreement expired by its own terms on June 1, 2014 [*Id.* ¶ 13]. Plaintiff asserts it paid over $1.5 million from 2008 through the commencement of this lawsuit for the business covered by the referral agreements, and that it continues to pay for this line of business and goodwill [*Id.* ¶ 17].

Before the agreement expired, in April 2014, a representative of Blue Jack's Seafood, a retail merchant, walked into a branch office of defendant and inquired as to the availability of credit and debit card processing and settlement services [*Id.* ¶ 14]. Defendant did not refer him to plaintiff; instead, defendant allegedly took this business opportunity for itself [*Id.*].

On May 23, 2014, defendant sent plaintiff a letter informing plaintiff that defendant would not renew the 2011 agreement and that, upon termination, defendant "elects to reject and no longer accept the Bank Compensation for Referrals or any other fee due Bank by Banc Card under the Agreement" [*Id.* ¶ 15]. Plaintiff responded on May 30, 2014 [*Id.* ¶ 16]. Plaintiff informed defendant of the post-termination restrictive covenants and that plaintiff would be honoring its post-expiration obligations, including the payment of the referral fees [*Id.*]. It also requested that defendant continue its non-disclosure and non-solicitation obligations [*Id.*].

According to plaintiff, defendant has partnered with Security Card Services, LLC, which has hired Express Employment Professionals, a recruiting service, to solicit a number of plaintiff's employees and sales representatives [*Id.* ¶ 19]. Plaintiff alleges,

upon information and belief, that defendant provided detailed personnel information to Security Card Services and that Express Employment Professionals has directly contacted plaintiff's employees, urging them to leave plaintiff and work for defendant [*Id.* ¶¶ 19–20]. Similarly, three Vice Presidents of defendant have contacted plaintiff's employees and sales representatives, offering them sales jobs in direct competition with plaintiff, as well as commercial lending positions [*Id.* ¶ 21].

Further, plaintiff asserts that defendant is attempting to solicit plaintiff's customers for whom plaintiff is still actively paying defendant a fee [*Id.* ¶ 22]. As an example, plaintiff notes that defendant contacted The Ridges Resort and Marina and instructed this business to hold off renewing any contract with plaintiff until defendant could provide rates and details for "United Community Payment Systems" [*Id.*]. As another example, plaintiff states that defendant also contacted The Griddle Café & Deli and defendant encouraged it to terminate its relationship with plaintiff [*Id.*].

Given all of this, plaintiff asserts a claim for breach of contract, asserting that defendant breached the non-compete and the confidentiality provision of the agreement between the parties [*Id.* ¶¶ 24–30]. Plaintiff also asserts a claim for common law tortious interference with business relations [*Id.* ¶¶ 31–36]. Plaintiff requests a temporary injunction, compensatory damages, treble or punitive damages, and other further appropriate relief.

## II. Analysis

A preliminary injunction "is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). One "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

When deciding a motion for a preliminary injunction, a district court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction; and (4) whether the movant has demonstrated a strong likelihood of success on the merits as to each claim. *Id.* (citation omitted); *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citing *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)). Courts should make findings as to each factor unless a discussion of fewer factors will resolve the case. *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994). No single factor is dispositive, *Cnty. Sec. Agency v. The Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002), but a finding that there is no likelihood of irreparable harm or no likelihood of success on the merits is often fatal, *see Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

7

### A. Irreparable Harm

Plaintiff asserts that it will be irreparably harmed in the event an injunction is not issued because seventy-eight percent of plaintiff's gross revenue stems from the customers that defendant referred to plaintiff. Henry Geny, President of Banc Card Georgia, LLC, testified that because defendant is a bank and plaintiff's customers are customers of that bank, defendant can leverage its position to convince plaintiff's customers to leave plaintiff and obtain the same services from defendant.[4] He further testified that loss of this business would be "devastating." And plaintiff claims that these losses are almost impossible to ascertain because of the fluctuation of revenue from year to year and the fact that revenue is based upon each "swipe" of a credit card.

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Overstreet*, 305 F.3d at 578 (citation omitted); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (stating that "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate" and providing "loss of customer goodwill" and "loss of fair competition that results from the breach of a non-competition covenant" as examples of losses that are difficult to calculate). Defendant argues that plaintiff's harm here, to the extent there is any, is fully compensable by monetary damages, and the Court agrees. As plaintiff highlighted during the hearing, as of May 31,

---

[4] As an example, Mr. Geny discussed a customer seeking an increase in his line of credit and defendant offering that increase so long as the customer moved his debit and credit card processing and settlement services from plaintiff to defendant.

2014, there is a finite number of merchants who plaintiff "signed up" after defendant referred them to plaintiff. Assuming defendant is contractually precluded from soliciting plaintiff's existing customers, as plaintiff asserts, the Court finds that, while the revenue that plaintiff would receive from those customers may fluctuate from year to year due to various circumstances, the harm that plaintiff anticipates sustaining upon the loss of these customers—monetary harm—is the type of harm an expert could readily ascertain using appropriate accounting methods. And that there may be a *Daubert* hearing about experts does not change the quantifiable nature of the harm that plaintiff claims it may suffer absent the requested injunction.

Moreover, the Court finds that the harm asserted by plaintiff is speculative at this time. A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted); *see also Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (stating that irreparable harm "must be both certain and immediate, rather than speculative or theoretical") (citation omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citation omitted).

When questioned by defense counsel, Mr. Geny admitted that he is aware of only one customer, out of 2,500 customers, who left plaintiff to begin a relationship with

9

defendant for the same services. Mr. Geny was not aware of the name of that customer, nor the circumstances surrounding that customer's termination of its relationship with plaintiff. Further, there was no evidence introduced by plaintiff, other than Mr. Geny's conjecture, that plaintiff's customers would actually terminate their relationships with plaintiff if solicited by defendant. Indeed, as all parties seemed to agree, plaintiff's customers are free to take their business wherever they choose, whenever they choose, absent agreements to the contrary (*e.g.*, an agreement with plaintiff to receive services from plaintiff for a specified term).[5] This factor thus weighs strongly in favor of denying the requested injunction.

### B. Likelihood of Success on the Merits

In order to establish a likelihood of success on the merits, plaintiffs must demonstrate "more than a mere possibility of success." *Barron v. PGA Tour, Inc.*, 670 F. Supp. 2d 674, 683 (W.D. Tenn. 2009) (citing *Six Clinics Holding Corp. II v. Cafcomp Sys.*, 119 F.3d 393, 402 (6th Cir. 1997)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair grounds for litigation and thus for more deliberative investigation." *Id.* However, "[t]he showing necessary to establish a likelihood of success on the merits varies inversely with the other three factors." *PartyLite Gifts, Inc.*

---

[5] The Court recognizes that plaintiff claims defendant has solicited at least one other customer [Doc. 14], but there is no evidence that the customer left plaintiff's company for defendant's company because of that solicitation nor evidence that the solicitation has damaged plaintiff's goodwill or reputation.

*v. Swiss Colony Occasions*, No. 3:06–CV–170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006) (citing *In re DeLorean*, 755 F.2d 1223, 1229 (6th Cir. 2000)).

### 1. Breach of Contract Claim

In the complaint, plaintiff asserts defendant breached the 2011 referral agreement by competing with plaintiff for the services of existing merchants for whom plaintiff is currently paying defendant a fee. Plaintiff further asserts that defendant breached the agreement by releasing the names of plaintiff's employees to Security Card Services, LLC, a recruiting company that has directly contacted these employees and attempted to convince them to leave plaintiff's company and join defendant's company.[6]

The Court first examines the breach of the confidentiality provision, and does so under Georgia law.[7] Defendant argues that plaintiff has not demonstrated that defendant disclosed any of plaintiff's confidential information as defined by the 2011 referral agreement. The Court agrees. Plaintiff introduced evidence that a recruiter contacted plaintiff's employees via their personal cell phones and knew the territories and merchants for which each employee was responsible, but plaintiff did not introduce any evidence indicating that defendant provided this information to the recruiter. Moreover,

---

[6] In its brief, plaintiff seemingly argues that defendant also violated a non-solicitation-of-plaintiff's-employees clause, but at the hearing, the parties clarified that the solicitation of plaintiff's employees shows only a breach of the confidentiality provision, not a breach of some non-solicitation clause.

[7] No party disputes that Georgia law applies here, as the 2011 referral agreement provides that it "is made and shall be construed under the laws of the State of Georgia without regard to any conflicts of law provisions thereof" [Doc. 1-2]. *See Certified Restoration*, 511 F.3d at 541 (noting that, in diversity actions, federal courts generally enforce the parties' contractual choice of forum and governing law).

11

the Court finds that this type of information may not fall within the confidentiality provision of the agreement because, as defendant demonstrated during the hearing, it is information that is commonly available from either the Internet or plaintiff's customers. Information that is publicly available cannot form the basis of a breach of a confidentiality clause. *See Williams v. Coffee Cnty. Bank*, 308 S.E.2d 430, 432 (Ga. Ct. App. 1983) (rejecting claim for breach of implied duty of confidentiality where "the only information disclosed was a matter of public record and indisputedly [sic] was not confidential" and questioning how one could be harmed by disclosure of information that could be obtained through appropriate public authorities).

Turning next to the breach of the "non-compete" clause, the 2011 referral agreement provides, "Both parties agree that they cannot directly or indirectly compete on any merchant account that Banc Card is paying to Bank a fee." Before examining whether defendant likely breached this restrictive covenant, the Court must examine defendant's argument that this covenant is unenforceable.

Plaintiff argues the agreement contemplated the sale of a line of business, so this clause of the agreement is presumed reasonable under the Georgia Restrictive Covenants Act, which became effective May 11, 2011 (the "Act"). Plaintiff further argues that because the agreement relates to the sale of defendant's line of business of providing credit and debit card processing and settlement services, and was entered into by parties of equal bargaining power, the agreement should receive less scrutiny. And it argues that the agreement is reasonably limited to protect the interests of plaintiff and is reasonable

12

in terms of duration and territory under Georgia law because it is limited to only those customers with whom plaintiff had a business relationship during the term of the agreement.

Defendant disagrees, contending the 2011 referral agreement, by its own terms, did not contemplate the sale of any line of business. And because it is merely a referral agreement, defendant argues the Act does not apply and there is no presumption of reasonableness. Defendant further argues that the non-compete clause is unenforceably vague and unreasonable. Finally, defendant contends that the clause applies only to the extent that defendant continues to accept referral fees from plaintiff, and it has elected not to receive these fees.

Given that the parties dispute the nature of the agreement, the Court addresses the nature of the agreement first. To reiterate, plaintiff urges that the agreement contemplates defendant selling plaintiff a line of business, whereas defendant urges that it merely contemplates defendant referring customers to plaintiff for plaintiff to solicit.

Based upon the record before it and the plain language of the agreement, the Court finds that the 2011 referral agreement (and the 2003 agreement that began the parties' relationship) is, as defendant contends, an agreement that contemplates defendant referring customers to plaintiff for debit and credit card processing and settlement services, not an agreement that contemplates the sale of an entire line of business of defendant. This conclusion stems from the language of the referral agreements, which provides that the purpose is to "set forth the obligations and rights of [defendant] and

13

[plaintiff] with respect to the referral by [defendant] to [plaintiff] from time to time, either orally or in writing, of a list of customers who may hereafter enter into agreements to receive Processing Services from an authorized [plaintiff] processor as a result of the direct solicitation efforts of [plaintiff]." Moreover, the evidence presented thus far in this proceeding demonstrates that there was no sale of assets, no sale of stock, and no transfer of goodwill. In a similar situation, a Georgia court declined to treat the contract at issue as a sale of business agreement. *Amstell, Inc. v. Bunge Corp.*, 443 S.E.2d 706, 707 (Ga. Ct. App. 1994) (finding an agreement "not in the nature of a contract for the sale of a business" in part because there was no sale of business assets, stock, or goodwill, and the contract did not grant any exclusive rights).

Given this finding, the Court further concludes that the Act has no application here and that the Court must examine the restrictive covenant under Georgia common law. *See* Ga. Code Ann. § 13-8-52 (providing that the Act applies only to the agreements described in subsection (a), which include agreements between or among employers and employees, distributors and manufacturers, lessors and lessees, partnerships and partners, franchisors and franchisees, sellers and purchasers of a business or commercial enterprise, and two or more employers); *see also* Ga. Code Ann. § 13-8-57(d) (limiting its application to specific types of sales). Under Georgia law, restrictive covenants "which impose[] an unreasonable restraint on trade [are] void as against public policy." *Northside Hosp., Inc. v. McCord*, 537 S.E.2d 697, 699 (Ga. Ct. App. 2000). In examining whether a restrictive covenant is a reasonable restraint on trade, Georgia

14

courts utilize one of three types of scrutiny: "strict scrutiny, which applies to employment contracts; middle or lesser scrutiny, which applies to professional partnership agreements; and much less scrutiny, which applies to sale of business agreements." *New Atlanta Ear Nose & Throat Assocs., P.C. v. Pratt*, 560 S.E.2d 268, 270–71 (Ga. Ct. App. 2002). Determining whether a restriction is reasonable is a question for the Court. *Pittman v. Coosa Med. Grp., P.C.*, 685 S.E.2d 753, 756 (Ga. Ct. App. 2009).

The Court need not address the level of scrutiny to apply here, however, because the Court finds there are three potential issues regarding the enforceability of the restrictive covenant. In particular, the Court finds that the restrictive covenant may be unenforceable (1) because defendant is no longer accepting a fee from plaintiff, (2) because plaintiff may have unclean hands, *see Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1380 (N.D. Ga. 2001) ("Morgan Stanley is estopped from seeking a restraining order against competitive conduct which it admits to engaging in. As demonstrated by Defendants' citation to Morgan Stanley's publicly filed pleadings, Morgan Stanley regularly hires brokers from competitors and, in so doing, engages in the very same practices that it challenges here."), or (3) because the restrictive covenant may be void for vagueness, *see Hamrick v. Kelley*, 392 S.E.2d 518, 519 (Ga. 1990) ("The 'blue pencil' marks, but it does not write. It may limit an area, thus making it reasonable, but it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area. The remedy for vagueness is an action for reformation and not a suit for injunction to enforce the contract."). Indeed, the Court finds this is a close

question, but, at this time, the Court has questions regarding what the provision means in prohibiting both parties from competing on the merchant accounts and what the term "compete" encompasses. The Court thus finds, at this stage of the proceedings, that plaintiff has not met the burden of demonstrating more than a mere possibility of success on the merits of its breach claim.

### 2. Tortious Interference Claim

Plaintiff asserts that defendant tortuously interfered with its business relationships with merchants to whom plaintiff provides debit and credit card processing services. Defendant urges the Court to examine this claim under Georgia law, and plaintiff has not opposed this request. The Court thus examines this claim under Georgia law.[8]

To recover under Georgia law on a claim for tortious interference with business relations, a plaintiff must demonstrate that the defendant "(1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3)

---

[8] "A federal court exercising diversity jurisdiction applies the choice-of-law or conflict rules of the forum state, in this case [Tennessee]." *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999). "Tennessee has adopted the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws to choice-of-law questions for tort claims such as . . . tortious interference with a contractual relationship." *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, No. 09-2127-STA, 2011 WL 4915886, at *5 (W.D. Tenn. Oct. 17, 2011) (citation omitted). "Under this approach, 'the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation.'" *Id.* (citation omitted). "[G]enerally, the law of the state where the injury occurred will have the most significant relationship to the litigation." *Id.*

Here, plaintiff alleges that defendant tortiously interfered with merchants with whom plaintiff has existing business relationships [Doc. 1-2 ¶¶ 32, 34]. The only merchants mentioned in the complaint are The Ridges Resort and Marina and The Griddle Cafe & Deli, both of which are located in Georgia [*Id.* at ¶ 22; Doc. 7]. Defendant's headquarters is also in Georgia [Doc. 7]. Under the significant relationship test as adopted in Tennessee, *see Carbon Processing*, 2011 WL 4915886, at *5, the Court finds that Georgia law applies to this claim.

16

induced a *third party or parties* not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 444 S.E.2d 814, 817 (Ga. Ct. App. 1994) (citation omitted). "The first element's requirement that the tortfeasor acted 'without privilege' requires proof that the defendant was an intermeddler or 'stranger' to the business relationship at issue." *ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc.*, 693 S.E.2d 559, 564 (Ga. Ct. App. 2010) (citation omitted). "An entity that is a party 'to an interwoven contractual arrangement' is not a stranger to any of the contracts or business relationships that are part of the contractual arrangement and cannot be held 'liable for tortious interference with any of [those] contracts or business relationships.'" *Id.* (citation omitted). The Court finds, based upon the record before it at this preliminary stage, that defendant was not likely a stranger to plaintiff's relationships with the merchants identified in the complaint because those merchants are also defendant's customers and were referred to plaintiff by defendant [*See* Docs. 1-2, 7-1]. *See id.* at 564 n.4 (citing case examples).

The Court thus finds that this factor weighs against granting the requested injunction.

### C. Substantial Harm to Others

While defendant asserts that issuing the requested injunction would interfere with the rights of plaintiff's existing customers to choose where they take their business, the Court does not necessarily agree with this assessment because, as already noted,

17

plaintiff's customers are free to take their business wherever they choose, whenever they choose, absent agreements to the contrary. Thus, the Court does not find that issuing the requested injunction would impede or stifle competition in this regard. And the Court finds that the harm to defendant from the requested injunction would be minimized by the fact that the injunction would prohibit defendant only from (1) soliciting or competing for a specific portion of plaintiff's existing customers and (2) disclosing plaintiff's confidential information, which no party disputes defendant has contractually obligated itself to keep confidential [Doc. 1-2]. It would not prohibit defendant from engaging in a competitive business with plaintiff nor using non-confidential information to so compete. This factor thus weighs neither in favor of nor against granting the requested injunction.

### D. Public Interest

In determining whether the public interest would be served by issuing the requested injunction, the Court recognizes the sanctity in upholding contractual provisions. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007). Yet, the interest in upholding the sanctity of contracts may still be protected without the imposition of a preliminary injunction. In addition, the Court recognizes that, under Georgia law, restraints on trade are disfavored. *See, e.g.*, *Riddle v. Geo-Hyrdo Eng'rs, Inc.*, 561 S.E.2d 456, 458 (Ga. Ct. App. 2002) ("'A contract in general restraint of trade or which tends to lessen competition is against public policy and is void.'" (citation omitted)). Thus, this factor also weighs neither in favor of nor against granting the requested injunction.

18

### III. Conclusion

Balancing the four factors, the Court finds that an injunction in this case is not warranted. The Court therefore **DENIES** plaintiff's motion for a preliminary injunction [Doc. 1-2]. The temporary restraining order [Doc. 4, Doc. 3-1] is hereby **VACATED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE